******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* GEORGE
MICHAEL LENIART
(AC 36358)

Prescott, Devlin and Sheldon, Js.

*Syllabus*

The defendant, who was convicted of capital felony and murder following
the disappearance of the fifteen year old victim, appealed from the
judgment of conviction, claiming, inter alia, that certain evidentiary
rulings violated his constitutional rights to confrontation and to present
a defense. At trial, the state presented testimony from A, who was
serving a ten year sentence for an unrelated crime, that he and the
defendant had sexually assaulted the victim, and, that when he met the
defendant the following day, the defendant had confessed to killing the
victim. In order to impeach A's credibility, the defendant sought to
admit a videotape depicting a police officer interviewing A prior to the
administration of a polygraph examination. The defendant claimed that
the videotape was relevant because it showed that A had been promised
favorable treatment in exchange for his cooperation. The trial court,
however, excluded the videotape on the ground that it constituted inad-
missible polygraph evidence under *State* v. *Porter* (241 Conn. 57). A
thereafter testified, inter alia, that he hoped to receive some consider-
ation from the state in exchange for his testimony. On the defendant's
direct appeal, this court agreed with the defendant's evidentiary claim
that the trial court had improperly excluded the videotape and found
that its exclusion was harmful and, accordingly, reversed the trial court's
judgment and remanded the case for a new trial. Both the state and the
defendant, on the granting of certification, appealed to our Supreme
Court, which affirmed this court's conclusion that the trial court improp-
erly excluded the videotape but concluded that any error was harmless
and, thus, reversed the judgment of this court and remanded the case
for a determination of whether the exclusion of the videotape violated
the defendant's constitutional rights. *Held* that the trial court's exclusion
of the videotape did not violate the defendant's constitutional rights:
although evidence tending to impeach A's trial testimony was central
and critical to the defense and the videotape provided support for the
defendant's claim that A's testimony was motivated by his own self-
interest, the defendant was able to present ample evidence from which
the jury could appropriately draw inferences relating to A's motives in
testifying, his credibility and his bias, and the defendant was able to
impeach A's testimony through other means, specifically through his
cross-examination of A; moreover, defense counsel devoted a consider-
able portion of his closing argument to A's motives in testifying and his
lack of credibility, including highlighting inconsistencies in A's testimony
and his statement to the police and A's motives in testifying against
the defendant.

(*One judge concurring separately*)

Argued February 6—officially released June 30, 2020

*Procedural History*

Substitute information charging the defendant with
three counts of the crime of capital felony and one
count of the crime of murder, brought to the Superior
Court in the judicial district of New London and tried
to the jury before *Jongbloed, J.*; thereafter, the court
granted the state's motion to preclude certain evidence;
verdict and judgment of guilty, from which the defen-
dant appealed; subsequently, this court, *Sheldon* and
*Prescott, Js.*, with *Flynn, J.*, concurring in part and
dissenting in part, reversed the judgment of the trial
court and remanded the case for a new trial, and the

state and the defendant, on the granting of certification, filed separate appeals with our Supreme Court, which reversed in part the judgment of this court and remanded the case to this court with direction to consider the defendant's remaining claims on appeal. *Affirmed.*

*Lauren M. Weisfeld*, chief of legal services, for the appellant (defendant).

*Stephen M. Carney*, senior assistant state's attorney, with whom, on the brief, was *Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

DEVLIN, J. This case returns to this court on remand from our Supreme Court following its reversal of our judgment reversing the judgment of conviction of the defendant, George Michael Leniart, of murder in violation of General Statutes § 53a-54a (a), and three counts of capital felony in violation of General Statutes (Rev. to 1995) § 53a-54b (5), (7) and (9), as amended by Public Acts 1995, No. 95-16, § 4.[1] The sole remaining claim before us is whether the trial court's improper exclusion of certain evidence at trial violated the defendant's rights under the United States constitution. We conclude that the defendant's constitutional rights were not violated, and, accordingly, affirm the judgment of conviction.

"The following facts, which the jury reasonably could have found, and procedural history are relevant to the claims before us. On May 29, 1996, the victim,[2] who was then fifteen years old, snuck out of her parents' home to meet Patrick J. Allain, a teenage friend also known as P.J., so that they could smoke marijuana, drink alcohol, and have sex. The two teenagers were picked up by the defendant, who at the time was thirty-three years old. They then drove to a secluded, wooded location near the Mohegan-Pequot Bridge in the defendant's truck.

"While parked, the victim and Allain kissed, drank beer, and smoked marijuana. At some point, the defendant, who had told Allain that he was in a cult, called Allain aside and told him that he wanted 'to do' the victim and that he 'wanted a body for the altar.'

"Allain, who feared the defendant, returned to the truck and informed the victim that he and the defendant were going to rape her. Allain then removed her clothes and had sex with her in the truck while the defendant watched through the windshield. After Allain and the victim finished having sex, the defendant climbed into the truck and sexually assaulted the victim while Allain held her breast. After the assault, the victim pretended not to be upset so that the defendant would not harm her further.

"The defendant then drove the teenagers back to Allain's neighborhood. The defendant dropped off Allain near his home, and the victim remained in the truck. The victim never returned home that night and was never seen again, despite a protracted nationwide search by law enforcement. The search also did not recover her body.

"Allain subsequently implicated the defendant in the victim's death. As a result, in 2008, the state charged the defendant with murder in violation of § 53a-54a, capital felony in violation of § 53a-54b (5) for murder in the course of a kidnapping, capital felony in violation of § 53a-54b (7) for murder in the course of a sexual

assault, and capital felony in violation of § 53a-54b (9) for murder of a person under the age of sixteen. The case was tried to a jury.

"The state's case against the defendant included the testimony of four witnesses, who each testified that, at different times, the defendant had admitted, directly or indirectly, to killing the victim. Allain, the state's key witness, was serving a ten year sentence for an unrelated sexual assault at the time of trial. He testified that, on the afternoon following the previously described events, the defendant had asked to meet with him on a path behind the Mohegan School in Montville. At that meeting, the defendant admitted that 'he had to do [the victim]—to get rid of her.' The defendant described to Allain how, after dropping Allain off the night before, he had pretended to run out of gas near the path.[3] He then ripped the license plates off his truck, dragged the frantic victim into the woods, and choked her. Later that evening, at a second meeting, the defendant further confessed to Allain that he had killed the victim and had 'erased' her by placing her remains in a lobster trap and dropping them into the mud at the bottom of the Thames River. The defendant was a lobster fisherman at the time." (Footnotes in original.) *State* v. *Leniart*, 333 Conn. 88, 93–95, 215 A.3d 1104 (2019).

"Prior to trial, the state filed a motion in limine seeking to exclude all testimony or evidence pertaining to the polygraph examination of any witnesses. Defense counsel opposed the motion, arguing that he intended to offer, among other things, a ninety minute videotape showing the standard pretest interview that the polygrapher, state police Trooper Tim Madden, had conducted with Allain prior to performing Allain's polygraph test in 2004. Defense counsel stated that he would seek to offer the videotape on the ground that it showed Madden giving Allain numerous assurances that Allain would receive favorable treatment if he cooperated with the police, which, defense counsel argued, 'raises questions . . . about whether this young man is coming into this courtroom with the intention to do anything other than save himself.'

"The trial court ruled that the videotape was inadmissible. The court's oral ruling appeared to adopt the state's argument that a recording of a pretest interview or, indeed, any reference to the fact that a polygraph examination has been conducted, constitutes polygraph evidence and is, therefore, per se inadmissible. The court did, however, indicate that it would permit defense counsel to cross-examine Allain regarding 'any promises or benefits that were made to him during the course of that interview.' " Id., 124–25.

"The jury returned a verdict of guilty on all counts. The court merged the verdicts into a single conviction of capital felony and sentenced the defendant to a term of life imprisonment without the possibility of release.

On appeal to [this court], the defendant raised various challenges to the trial court's evidentiary rulings and also claimed, relying in part on the common-law corpus delicti rule, that the evidence was insufficient to sustain his conviction. *State* v. *Leniart,* [166 Conn. App. 142, 146–49, 140 A.3d 1026 (2016)]. [This court] rejected the defendant's sufficiency claim but concluded that the trial court incorrectly had excluded the polygraph pretest interview videotape, as well as expert testimony relating to the credibility of jailhouse informants. [This court] then concluded that those evidentiary rulings substantially affected the verdict and, accordingly, remanded the case for a new trial.

"[Our Supreme Court] granted the state's petition for certification to appeal, limited to the questions of whether [this court] correctly concluded that the trial court had erroneously excluded the polygraph pretest interview videotape and expert testimony regarding jailhouse informant testimony and that those rulings substantially affected the verdict. *State* v. *Leniart,* 323 Conn. 918, 150 A.3d 1149 (2016). [The Supreme Court] also granted the defendant's petition for certification to appeal, limited to the question of whether [this court] properly applied the corpus delicti rule in concluding that there was sufficient evidence to sustain his conviction of murder and capital felony. *State* v. *Leniart,* 323 Conn. 918, 918–19, 149 A.3d 499 (2016)." (Footnote omitted.) *State* v. *Leniart,* supra, 333 Conn. 96.

Our Supreme Court affirmed this court's rejection of the defendant's challenge to the sufficiency of the evidence. Id., 93. The Supreme Court also affirmed this court's conclusion that the trial court improperly excluded the polygraph pretest interview videotape. Id. The Supreme Court concluded, however, that "any error in the exclusion of the video was harmless"; id., 124; and, thus, reversed the judgment of this court,[4] and remanded this case for determination of the final issue of whether the exclusion of the videotape violated the defendant's constitutional rights. Id., 152 and n.35.

In assessing the evidentiary issue raised by the exclusion of the videotape and its subsequent determination that the exclusion was harmless, the Supreme Court set forth the following relevant description and analysis of its content, and of Allain's testimony at trial. "Madden's pretest interview of Allain lasted for approximately ninety minutes. For the first thirteen minutes or so, Madden and Allain discussed Allain's reasons for submitting to the polygraph. Specifically, a question arose as to whether Allain was taking the test voluntarily, because he believed that assisting the state was the right thing to do or, rather, because he was facing a potential five year sentence for having violated his probation through a failed drug test and had been led to believe that the state might not pursue a conviction if he cooperated in this matter. Allain initially indicated

that he had consented to the polygraph primarily to avoid the conviction for violating his probation. Madden promptly explained, in no uncertain terms, that he could not perform the polygraph on those terms. Thus, before proceeding, Madden obtained from Allain a statement that he was participating freely.

"The remainder of the pretest interview consisted of Madden's asking Allain a series of background questions, reviewing the statements that Allain had given to the police and Allain's accounts of the events surrounding the victim's disappearance, and explaining the questions that Allain would be asked during the polygraph. During that time, Madden repeatedly emphasized how 'unbelievably important' it was for Allain to give completely truthful answers during the examination.

"Moreover, Madden consistently equated truthfulness with successfully passing the test, doing 'the right thing,' and being a reliable witness. He emphasized in this respect that the state would consider Allain to be a useful witness, and Allain would qualify for potentially favorable treatment, only if the polygraph results demonstrated that Allain was being completely truthful and forthcoming. Madden referred several times during the interview to the investigation of the 1997 gang rape and murder of Maryann Measles. He informed Allain that suspected participants in that crime who *truthfully* confessed their roles and then passed polygraph examinations were let off with 'a slap on the wrist,' whereas suspected participants who failed polygraph tests were aggressively prosecuted.

"At several points during the interview, Madden made comments indicating that the police were interested in obtaining Allain's cooperation. In particular, Madden explained that the police were interested in having Allain on their 'team' rather than on the defendant's team, and in procuring Allain's assistance in 'getting' the defendant, whom Madden described as the 'bigger fish.' In each instance, however, he made clear that Allain could provide such assistance only by giving completely truthful testimony and passing the polygraph test. Madden indicated, for example, that, if Allain failed the polygraph, then he would be on the 'other team,' aligned with the defendant, rather than 'on our team.' In other words, Madden made clear that only truthful statements would help Allain.

"Throughout the interview, Madden made comments that gave the impression that he believed that Allain had not been completely forthcoming in his prior statements to the police and that Allain still had something to 'get off [his] chest.' In a few instances, Madden speculated that Allain felt intimidated or frightened by the defendant. In most instances, however, Madden appeared to believe that what Allain was withholding was the extent of his own involvement in the crime. Madden even suggested that this might be a cause of

Allain's diagnosed clinical depression and speculated that Allain, by telling the complete truth, might find some relief. . . .

"After the trial court ruled the videotape inadmissible, the state called Allain to testify. The prosecutor began his direct examination by eliciting that Allain was then serving a ten year sentence for felony sexual assault involving a different victim, and that Allain was hoping for 'leniency' in connection with that sentence in exchange for his cooperation with the state and testimony against the defendant in the present matter. Allain acknowledged that 'it would be nice' to receive some consideration in exchange for his testimony.

"On cross-examination, defense counsel effectively developed all of the basic facts and themes that the defendant sought to establish through use of the pretest interview videotape. Defense counsel was able to demonstrate that Allain was generally unreliable as a witness. For example, defense counsel repeatedly returned to the theme that Allain had two powerful incentives to cooperate with the state in convicting the defendant, namely, to divert attention from himself as a suspect in the victim's murder and to obtain a reduction of the sentence that he was then serving for sexual assault. With respect to the former, Allain admitted to having raped the victim on the night she disappeared and to having concealed that information from the police until after the statute of limitations for rape had expired. He also understood, however, that the statute of limitations for a felony murder never runs.

"Allain also acknowledged that he had found and concealed the victim's shoe the day after she disappeared, and that this could make him an accessory to her murder. He also admitted to telling the police that he had previously indicated to the defendant that he was willing to kill the victim, and that he later told his father that he was involved in the victim's murder and that he needed help moving her body. . . . Allain admitted that he was concerned because, if the police believed that he had anything to do with the victim's death, he still could be charged with capital felony, and he believed that he would face a likely death sentence if convicted. At the same time, Allain, without expressly mentioning the pretest interview, testified that Madden had repeatedly told him that even someone who had been involved in rape and murder 'could walk away . . . with a slap on the hand' if they cooperated with the police. . . . Accordingly, the jury was aware that Allain was a potential suspect in the victim's murder, that he had implicated himself in the murder, and that he understood that he could be charged with the crime if the defendant were exonerated.

"The jury also heard testimony suggesting that there was an implicit agreement between Allain and the state that he would receive leniency on his sexual assault

sentence if he fully cooperated with the state in this matter and if his cooperation proved sufficiently helpful. Allain twice acknowledged that, at the time he was sentenced on that conviction, the state's attorney had indicated that the state would not oppose a motion for sentence modification at a later date if Allain met certain unstated requirements. Allain testified that he understood that to mean that he might be allowed to serve less time if he 'played ball' and cooperated in the defendant's case.

"At several points, Allain expressed hope that the state would believe that he had provided substantial assistance in the case against the defendant and that, if his cooperation was sufficiently valuable, he would be released from prison early. Indeed, Allain complained that he had been 'blackmailed' by the state and that an especially long sentence had been imposed for the sexual assault conviction specifically to ensure that he assisted the state in the defendant's case.

"Accordingly, the jury learned through cross-examination that Allain felt pressured to cooperate and that he hoped that the state would deem his help sufficiently valuable that he would obtain a sentence modification." (Citation omitted; emphasis in original; footnotes omitted.) Id., 128–32. The Supreme Court thus concluded that "all of the basic facts and themes that the defendant sought to show to the jury through the pretest interview videotape were effectively elicited during Allain's cross-examination . . . ." Id., 132. The defendant disagrees and contends that his constitutional rights to confrontation and to present a defense were violated by the exclusion of the videotape. We are not persuaded.

"It is fundamental that the defendant's rights to confront the witnesses against him and to present a defense are guaranteed by the sixth amendment to the United States constitution. The sixth amendment provides in relevant part: In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor . . . . A defendant's right to present a defense is rooted in the compulsory process and confrontation clauses of the sixth amendment . . . . Furthermore, the sixth amendment rights to confrontation and to compulsory process are made applicable to state prosecutions through the due process clause of the fourteenth amendment. . . .

"In plain terms, the defendant's right to present a defense is the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . It guarantees the right to offer the testimony of witnesses, and to compel their attendance, if necessary . . . . Therefore, exclusion of evidence offered by the defense may result in the denial of the defendant's right to present

a defense. . . .

"The right of confrontation is the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . .

"Impeachment of a witness for motive, bias and interest may also be accomplished by the introduction of extrinsic evidence. . . . The same rule that applies to the right to cross-examine applies with respect to extrinsic evidence to show motive, bias and interest; proof of the main facts is a matter of right, but the extent of the proof of details lies in the court's discretion. . . . The right of confrontation is preserved if defense counsel is permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . .

"Although it is within the trial court's discretion to determine the extent of cross-examination and the admissibility of evidence, the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements [of the confrontation clause] of the sixth amendment. . . .

"These sixth amendment rights, although substantial, do not suspend the rules of evidence . . . . A court is not required to admit all evidence presented by a defendant; nor is a court required to allow a defendant to engage in unrestricted cross-examination. . . . Instead, [a] defendant is . . . bound by the rules of evidence in presenting a defense. . . . Nevertheless, exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights . . . . Thus, [i]f the proffered evidence is not relevant [or constitutes inadmissible hearsay], the defendant's right[s] to confrontation [and to present a defense are] not affected, and the evidence was properly excluded." (Citations omitted; internal quotation marks omitted.) *State* v. *Wright*, 320 Conn. 781, 816–19, 135 A.3d 1 (2016).

"[W]hether a trial court's [exclusion of evidence offered by a criminal defendant] deprives [him] of his [constitutional] right to present a defense is a question that must be resolved on a case by case basis. . . . The primary consideration in determining whether a trial court's ruling violated a defendant's right to present a defense is the centrality of the excluded evidence to the claim or claims raised by the defendant at trial." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 276, 96 A.3d 1199 (2014). Moreover, "[a]

defendant may not successfully prevail on a claim of a violation of his right to present a defense if he has failed to take steps to exercise the right or if he adequately has been permitted to present the defense by different means." *State* v. *Santana*, 313 Conn. 461, 470, 97 A.3d 963 (2014).

"If . . . we conclude that the trial court improperly excluded certain evidence, we will proceed to analyze [w]hether [the] limitations on impeachment, including cross-examination, [were] so severe as to violate [the defendant's rights under] the confrontation clause of the sixth amendment . . . . In evaluating the severity of the limitations, if any, improperly imposed on the defendant's right to confront, and thus impeach, a witness, [w]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial. . . . We consider de novo whether a constitutional violation occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Halili*, 175 Conn. App. 838, 852–53, 168 A.3d 565, cert. denied, 327 Conn. 961, 172 A.3d 1261 (2017).

In this case, the defendant sought to introduce the videotape of the pretest interview into evidence at trial on the ground that it showed Madden giving Allain numerous assurances that Allain would receive favorable treatment if he cooperated with the police, which, defense counsel argued, "raises questions . . . about whether this young man is coming into this courtroom with the intention to do anything other than save himself." On appeal, he claims that his right to confrontation was violated when the trial court excluded the videotape from evidence because, through the videotape, he "sought to elicit the psychological context of [Allain's] polygraph, and especially the pretest where . . . Madden can be seen frightening and inducing him to cooperate, to show motive and bias." The defendant claims that the videotape demonstrated Allain's "vulnerable status . . . as well as [his] possible concern that he might be a suspect in the investigation." (Emphasis omitted; internal quotation marks omitted.) He argues that by excluding the videotape, "[t]he court prohibited relevant inquiry reasonably aimed at eliciting facts from which the jury might decide to disbelieve [Allain]." As to his claim that the exclusion of the videotape violated his right to present a defense, he claims that he was prevented from presenting his theory at trial that Allain was "the culprit" and that the exclusion of the videotape "violated his right to show that [Allain] was motivated by a desire to avoid being charged." The defendant also contends, more generally, that he was denied the right to "show whatever interest or motive [Allain] had." The defendant further argues that the cross-examination of Allain was no substitute for the videotape because the videotape showed "Madden's use of fear and promises"

in questioning Allain, and that Madden "manipulated [Allain] by discouraging him from getting a lawyer, and by representing that the [polygraph] test would be 'medicinal.' "

In assessing the defendant's claim that his sixth amendment rights to confrontation and to present a defense have been violated, we first assess the centrality of the excluded evidence, the videotape, to the case, or, more specifically, to the defendant's claim that Allain's testimony was not credible because it was motivated by Allain's desire not to be implicated in the murder of the victim in this case and to serve a lesser sentence on the unrelated sexual assault for which he was incarcerated at the time of trial. It cannot reasonably be disputed that Allain's testimony was central to the state's case, and the jury's ability to assess and the defendant's ability to impeach the credibility of that testimony were critical. The more focused question, however, is whether the excluded videotape was central and critical to the defendant's case because it highlighted Allain's motives to testify as he did at trial. Again, we do not believe that it reasonably can be disputed that evidence tending to impeach Allain's trial testimony was central and critical to the defense, and the videotape certainly provided support for the defendant's claim that Allain's testimony was motivated by his own self-interest.

Our constitutional inquiry, however, does not end here. We must next determine whether the defendant was able to present his theory of the case, or to present evidence to prove Allain's motives in testifying and to impeach his testimony, through other means, specifically through the cross-examination of Allain. "Both this court and our Supreme Court have stated that, when a defendant is afforded wide latitude in cross-examining a state's witness as to credibility, claims of sixth amendment violations for restrictions on cross-examination are indicia of the defendant [putting] a constitutional tag on a nonconstitutional claim."[5] (Internal quotation marks omitted.) *State* v. *Bermudez*, 195 Conn. App. 780, 807, A.3d , cert. granted, 335 Conn. 908, A.3d (2020); see id., 808 (defendant given ample opportunity to impeach credibility of witnesses); see also *State* v. *Jordan*, 329 Conn. 272, 287–88 n.14, 186 A.3d 1 (2018) (claim of improper exclusion of evidence of victim's convictions not constitutional in nature when jury heard testimony that, if credited, would support theory of self-defense); *State* v. *Leconte*, 320 Conn. 500, 511, 131 A.3d 1132 (2016) (no constitutional violation where defendant was given ample opportunity to "expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness"); *State* v. *Romanko*, 313 Conn. 140, 151–52, 96 A.3d 518 (2014) (no constitutional violation where defendant was permitted to present his the-

ory of case "by means other than the proposed demonstration"); *State* v. *Mark R.*, 300 Conn. 590, 612, 17 A.3d 1 (2011) ("over the course of a cross-examination of the victim that filled more than thirty transcript pages, the trial court did permit defense counsel to inquire into numerous elements of the defendant's fabrication theory"); *State* v. *Osimanti*, 299 Conn. 1, 10–13, 6 A.3d 790 (2010) (no violation of right to confrontation where defendant was permitted to present alternative evidence by way of cross-examination in support of his claim of self-defense and was able to refer to and emphasize that evidence in closing argument to jury); *State* v. *William C.*, 267 Conn. 686, 707–708, 841 A.2d 1144 (2004) (improper exclusion of records of Department of Children and Families indicating problems with victim's veracity in sexual assault case was, although harmful evidentiary error, not of constitutional magnitude, because defendant had opportunity to elicit issues concerning victim's veracity through extensive cross-examination); *State* v. *Sandoval*, 263 Conn. 524, 549, 821 A.2d 247 (2003) ("defense counsel aggressively cross-examined the victim in an attempt to convey to the jury that any participation by the defendant in the attempted abortion was consensual and that the victim falsely had accused the defendant of seeking to abort the pregnancy against her will"); *State* v. *Kelly*, 256 Conn. 23, 76, 770 A.2d 908 (2001) (no violation of constitutional right to present defense where subject matter of precluded testimony was presented through other witnesses); *State* v. *Shabazz*, 246 Conn. 746, 758 n.7, 719 A.2d 440 (1998) (no deprivation of constitutional right to present defense when "defendant was adequately permitted to present his claim of self-defense by way of his own testimony, by cross-examining the state's witnesses, and by the opportunity to present any other relevant and admissible evidence bearing on that question"), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999); *State v. Barletta*, 238 Conn. 313, 322–23, 680 A.2d 1284 (1996) (improper restriction on expert's testimony about likely effects of cocaine ingestion on eyewitness was not of constitutional magnitude because defendant permitted to cross-examine that eyewitness about her cocaine use, criminal record including narcotics convictions, and inducement from state to testify); *State* v. *Jones*, 205 Conn. 723, 730–32, 535 A.2d 808 (1988) (improper restriction on testimony of defendant's sister concerning reasons for defendant's flight, namely, his fear of victim's family, was not of constitutional magnitude because defendant had explained flight in his own testimony); *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985) (wide latitude of cross-examination by defendant suggestive that claimed evidentiary errors were nonconstitutional in nature); *State* v. *Porfil*, 191 Conn. App. 494, 523–24, 215 A.3d 161 (2019) (no constitutional violation where defendant was able to adequately present his defenses of misidentification and lack of possession by other

means and had additional, alternative avenues available to him to further bolster his defenses), cert. granted on other grounds, 333 Conn. 923, 218 A.3d 67 (2019); *State* v. *Durdek*, 184 Conn. App. 492, 511 n.10, 195 A.3d 388 (noting that "multiple avenues of impeachment" afforded to defendant in cross-examining "important state witness" supported conclusion that claimed errors were evidentiary, not constitutional, and defendant therefore had burden of establishing harm), cert. denied, 330 Conn. 934, 194 A.3d 1197 (2018); *State* v. *Papineau*, 182 Conn. App. 756, 780–82, 190 A.3d 913 (no violation where defendant was permitted to present evidence by means other than narrow inquiry that was excluded by trial court), cert. denied, 330 Conn. 916, 193 A.3d 1212 (2018); *State* v. *Manousos*, 179 Conn. App. 310, 333, 178 A.3d 1087 (no constitutional violation where defendant was able to present his defense in full through other, unlimited testimony), cert. denied, 328 Conn. 919, 181 A.3d 93 (2018); *State* v. *Thomas*, 110 Conn. App. 708, 718, 955 A.2d 1222 ("[b]ecause the theory in question provided at most merely one more motivation to attack, its exclusion did not foreclose an entire defense theory and, therefore, did not rise to the level of a constitutional violation"), cert. denied, 289 Conn. 952, 961 A.2d 418 (2008).

In this case, we agree with the state that the defendant was able to elicit testimony regarding Allain's motives in testifying and to adequately impeach that testimony through cross-examination and, thus, was not prevented from presenting his defense to the jury. By way of the unbounded and rigorous cross-examination of Allain, the transcript of which spans approximately 140 pages, defense counsel effectively challenged Allain's credibility. During cross-examination, defense counsel focused on Allain's motivations in testifying—to avoid implication in the murder of the victim and to obtain a lesser sentence on the sexual assault charge for which he was then incarcerated. Allain openly acknowledged that he had strong incentives to testify in this case. He admitted, after several years of denying, that he had raped the victim in this case on the night in question, but he knew that the statute of limitations on that charge had expired and, thus, that he could not be charged with that rape. He understood, however, that he could still be charged with murder because there was no statute of limitations on that charge. Although Allain denied defense counsel's suggestion that he was motivated to inculpate the defendant in the hope of exculpating himself, stating that his testimony was truthful, he admitted that, despite speaking to members of the major crime squad approximately twenty-five times, he had never been entirely truthful with the police throughout the course of the investigation. Allain testified at trial to several facts that he admittedly had never told any of the law enforcement officers with whom he had spoken over the course of the ten year investigation.[6]

Allain even admitted during cross-examination that he was "making up things about what [he] thought was in [the defendant's] mind" pertaining to the victim, and that he had told the defendant that he would kill the victim himself.

During direct examination by the state, Allain acknowledged that he was then serving a ten year sentence for a felony sexual assault charge and that he was hoping for leniency in exchange for his testimony against the defendant in this case. Allain testified that he thought that the sentence that he received on that sexual assault charge was excessive, and that it was designed to compel him to testify in this case. On the basis of his perception of the sentence in that case as excessive, Allain testified that he felt as though he had been "blackmailed" to testify in this case so that he might receive a downward sentence modification later. As noted, Allain admitted that he hoped "that the state believes that [he] provided substantial assistance in [its] case against [the defendant] . . . ." He expressed his hope that the state believed that his "cooperation in this case was valuable enough" to obtain a sentence modification on his sexual assault charge.

In sum, the court allowed defense counsel to inquire repeatedly into Allain's motivations to testify—his desire to avoid his own implication in the murder of the victim in this case and his quest for a lesser sentence on the sexual assault charge for which he was incarcerated at the time of trial. Not only did the court not restrict defense counsel's inquiry, but that inquiry was effective and impactful. The jury was not only provided with an adequate opportunity to judge the credibility and bias of Allain, but a fair reading of the cross-examination leads to an inexorable conclusion that Allain's testimony was motivated by his own interests and his overall credibility had been damaged.

Moreover, defense counsel devoted a considerable portion of his closing argument to Allain's motives in testifying for the state and his lack of credibility. Defense counsel told the jury that it was "entitled to consider a witness' interest in the outcome of this case when rendering [its] verdict," and posited: "Who more than . . . Allain has an interest in—besides [the defendant]—in the [outcome] of this case?" Defense counsel underscored the incredibility of Allain's testimony by tracking each of Allain's statements to the police, all the way to his testimony at trial, and highlighting inconsistencies between his testimony on direct examination and cross examination.[7] As with cross-examination, defense counsel effectively demonstrated to the jury the flaws in Allain's testimony in support of counsel's claim that Allain was not a credible witness. Defense counsel told the jury: "Allain has never told the same story twice" and that Allain was "a practiced liar" and "a stranger to the truth." Finally, defense counsel

emphasized Allain's motives in testifying against the defendant when he argued to the jury that "the State of Connecticut has charged the wrong man; that the State of Connecticut cut a deal with the man who knew where the body is and is still afraid to tell it because they may kill him; that . . . Allain has everything to gain by the conviction of [the defendant] . . . ."

Because the defendant was permitted to present ample evidence from which the jury could appropriately draw inferences relating to Allain's motives and credibility, his rights to confrontation and to present a defense were preserved. Accordingly, the defendant's arguments that his constitutional rights were violated because the exclusion of the videotape "prohibited relevant inquiry reasonably aimed at eliciting facts from which the jury might decide to disbelieve [Allain]" and that he was prevented from demonstrating Allain's motives and biases are unavailing.

The judgment is affirmed.

In this opinion, *Sheldon, J.*, concurred.

[1] For the sake of simplicity, we note that all references in this opinion to § 53a-54b are to General Statutes (Rev. to 1995) § 53a-54b, as amended by Public Acts 1995, No. 95-16, § 4.

[2] In accordance with our policy of protecting the interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[3] "Although Allain's testimony was unclear on this point, the jury reasonably could have concluded that the path on which Allain and the defendant spoke is the same path to which the defendant confessed having taken the victim." *State* v. *Leniart*, 333 Conn. 88, 95 n.3, 215 A.3d 1104 (2019).

[4] The Supreme Court also held that this court incorrectly concluded that the trial court had abused its discretion in precluding expert testimony regarding jailhouse informant testimony. See *State* v. *Leniart*, supra, 333 Conn. 93.

[5] By contrast, a constitutional violation arises when a defendant is wholly prohibited from inquiring into an area pertaining to his or her defense at trial, particularly when a witness' credibility, motives or bias are at issue. See, e.g., *State* v. *Peeler*, 271 Conn. 338, 383–85, 857 A.2d 808 (2004) (trial court's failure to admit mental health records of state's witness precluded relevant line of inquiry into witness' ability to perceive events and was therefore of constitutional magnitude), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005); see also *State* v. *Slimskey*, 257 Conn. 842, 859, 779 A.2d 723 (2001) ("[h]aving determined that the evidence in issue was especially probative and having concluded that there was no other available means of inquiry into the victim's propensity to lie, we necessarily have concluded that the confrontation clause requires the disclosure").

[6] For example, Allain testified for the first time in court that the defendant told him that he was in a satanic cult, that he spoke to the defendant for about three minutes about the defendant's desire to kill the victim and that the defendant was giggling about it. He testified that, after he and the defendant raped the victim, he and the victim discussed the need to get "a good night's rest" in order "to prepare for school the next day" and that the victim casually told them that she had "always wanted to have sex with two guys."

[7] Defense counsel argued to the jury: "There are more peaks and valleys in [Allain's] testimony than there is in the Rocky Mountains. . . . When [Allain] first went to the police in October of 1997, he told them all about being with that young woman that night. But he denied having any sexual contact with her, he denied having any real misconduct at all. He made it all sound out to be just like a night of partying. I may have misspoke—he may have said he had sex with her; that I may have gotten wrong. But he didn't make out any crimes.

"Then he spoke to the police on a second occasion. We've got these here—not all of these are exhibits—but I spent a lot of time cross-examining

[Allain] and I want to tell you why. I listened very carefully and I'd ask you to do this as you deliberate.

"Go through what they said, each of them. Make the list. . . . What did they say on direct and what did they say on cross.

"In October of 1997, [Allain's] with [the defendant]. They're with this young man; not much happens. We get then to another statement—and again, I don't mean to harp on this stuff and I'm not asking you to let [the defendant] go because the police can't keep track of dates—but maybe it was in November of 2001, maybe it's 2007; I don't really know. The date says one thing, the testimony's another.

"In 2004, [Allain] gives another statement. In this statement, he talks about some—a little bit more. This time [the defendant] has killed her now or [the defendant] says he was going to kill her. She jumps out of the van. But you know, [Allain] has some voluntary consensual sexual activity with her.

"In 2007, it's now this whole business about we're going to rape you. On the stand when I questioned him, he finally came around to rape but he pussyfooted around about that, too. I'd suggest to you that [Allain's] pussy-footing around because [Allain] knows where that body is and if [Allain] tells anybody, they'll seek to kill him. It's that simple.

"Nobody is going to pity poor [Allain] if he acknowledges his role in the rape and the murder of [the victim] and tells this jury—you, them, anybody in this room—something he's never told anybody but he wanted his father's help with. I need to move that body, it's up there near the Mohegan reservation—not near any water. It's up there near the Mohegan reservation.

"[The defendant] didn't dump it in the river. He didn't dump it in the Sound. He didn't chop her up. He didn't put her in the mud. He didn't put her in a well. It's up there near the reservation and dad help me and his father didn't and his dad ratted him out as it were and then [Allain] had to dance and he's dancing still."

Defense counsel further argued: "Then we get really not much more in the case. You know, [Allain's] out there, he's given a statement in [1997]. He gave one in maybe [2004], maybe [2007]. No warrant, no arrest. He's claiming the body's up there near the casino. He testifies in the trial then about a well. . . .

"If you need to hear from [Allain] again, listen to the entire testimony and what you will find out is that story he told on the stand, it doesn't agree with the story he told in 1997, it doesn't agree with the story he told in 2004, it doesn't agree with the story he told in 2007.

"Some of the things he told you in this room, you heard for the very first time—well, of course you did, but I mean, law enforcement heard for the very first time. [Allain] is a stranger to the truth and that desperate men do desperate things."

―――――――――――――――――