******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MARK CUSSON
## (AC 43352)

Prescott, Cradle and DiPentima, Js.

### *Syllabus*

Convicted, after a jury trial, of the crimes of cruelty to persons and disorderly conduct, the defendant appealed to this court. The defendant, a former forensic nurse for a maximum security psychiatric facility operated by the Department of Mental Health and Addiction Services, and other facility staff, physically abused and demeaned the victim, who suffered from several mental health disorders and was committed to the facility. After the department learned of the defendant's conduct, it informed state law enforcement and launched an administrative investigation, which led to criminal charges and adverse employment actions against several employees, including the defendant. Prior to trial, the trial court held a hearing on the state's motion in limine seeking to preclude the admissibility of the victim's testimony on the ground that he was incompetent to testify at trial pursuant to the relevant section (§ 6-3) of the Connecticut Code of Evidence. At that hearing, the state offered expert testimony from the victim's treating psychiatrist, who had personally observed the victim multiple times per day, nearly every day, for a period of two years. The defendant argued that the psychiatrist's testimony alone was insufficient to establish that the victim was incapable of providing reliable and truthful testimony and moved for an independent psychiatric evaluation of the victim, which the court denied, or, in the alternative, the defendant requested that the court evaluate the victim under oath. The court granted the state's motion to preclude the victim's testimony and credited the testimony of the victim's psychiatrist, who testified that the victim had poor cognitive memory, had trouble retaining information, was unable to narrate events or recall past experiences in a rational way, and posed a safety risk to others. Before trial, the defendant moved for sanctions and argued that the prosecution had engaged in witness intimidation because the department attempted to intimidate the defense witnesses, H and L, facility employees, from testifying at trial on the defendant's behalf and such misconduct was attributable to the state through a theory of vicarious liability. H and L previously appeared at a sentencing proceeding for another facility employee who was accused of similar misconduct toward the victim as the defendant. At that proceeding, H and L allegedly exposed the victim's confidential and protected medical information while giving their statements to the court in violation of work rule policies and the Health Insurance Portability and Accountability Act (HIPAA), and, subsequently, were placed on administrative leave by the department, pending investigation. When called to testify at the pretrial hearing for the defendant, the prosecutor informed the court that there was a possibility that L could incriminate herself if she were to testify at the hearing. L invoked her fifth amendment right against self-incrimination and provided little substantive testimony, and H testified that she was afraid to lose her job but would appear at the defendant's trial if subpoenaed and would testify at trial if ordered to by the court with the understanding that her testimony would not violate work rules. At that same hearing, another defense witness, B, a human resources manager for the department, who was responsible for investigating and conducting fact-finding for alleged work rule and policy violations, testified that the victim's conservator had signed releases that permitted the defense witnesses to testify regarding the victim's health status and, therefore, the department would not take action against witnesses who testified regarding the victim. On the defendant's appeal to this court, *held*:

1. The defendant could not prevail on his claim that the trial court violated his sixth amendment right to present a defense by failing to take adequate procedural measures before ruling that the victim was incompetent to testify at the defendant's trial:

   a. The trial court properly exercised its discretion when it declined the defendant's request to contemporaneously observe the victim before

ruling on his competency to testify at trial, contrary to the defendant's claim, *State* v. *Weinberg* (215 Conn. 231) did not stand for the proposition that the court must personally observe a potential witness prior to making a competency determination; moreover, in *Weinberg*, the trial court relied on the substance of the expert psychiatrist's testimony, and not its own contemporaneous examination, to make its legal determination regarding the witness' capacity for truthfulness, cognitive memory, and ability to receive correct sensory impressions; furthermore, under the circumstances of the present case, the expert, who had personally observed the victim multiple times per day, nearly every day, for two years, had provided firsthand, expert testimony, which established that the victim had limited cognitive memory, was not oriented to time, and offered irrational responses to even the most basic questions and, therefore, provided an adequate evidentiary basis to determine that the victim was not competent to testify.

b. The trial court properly exercised its discretion when it denied the defendant's motion to have the victim examined by an independent expert witness before ruling on his competency to testify, the decision to order a psychiatric examination is within the discretion of the trial court judge; moreover, the victim had undergone a psychiatric assessment by a board certified psychiatrist who, having personally observed him nearly every day for two years prior to the hearing, was uniquely positioned to assist the court in evaluating the victim's testimonial capacity; furthermore, the court reasonably could have determined that ordering a second evaluation would have been redundant and a waste of judicial resources.

2. Contrary to the defendant's claim, the trial court did not violate his due process right to present witnesses and properly exercised its discretion when it denied the defendant's motion to sanction the prosecution for intimidating potential defense witnesses from testifying at trial: there was no evidence that the department sought to intimidate defense witnesses through administrative discipline, any prior disciplinary action taken by the department against H and L was the sole result of their alleged HIPAA violations, and, at the time of the evidentiary hearing, H and L were not under threat of administrative discipline as the victim's conservator had signed releases that permitted them to testify regarding the victim's health status without violating HIPAA; moreover, the department was not acting as an arm of the state, although prosecutorial misconduct may extend to state agencies acting on the prosecution's behalf, there was no demonstrated relationship between the prosecution and the specific adverse employment actions taken by the department against H and L, and there was no evidence that B, who was primarily responsible for the internal investigation, had any contact with any law enforcement body during the pendency of the investigation.

3. The defendant could not prevail on his claim that the prosecution engaged in impropriety when it alerted the trial court to a potential fifth amendment concern with a defense witness' expected testimony during a pretrial hearing, thereby violating his constitutional right to a fair trial: there was no evidence to indicate that the prosecutor undertook his warning with the intention to chill L from testifying; moreover, the prosecutor repeatedly stated that the state did not intend to pursue criminal charges against the witness; furthermore, the defendant could not prevail on his claim that the trial court denied his right to present a defense and compel testimony in his favor by improperly granting L a blanket fifth amendment privilege during the pretrial hearing on the defendant's motion for sanctions, the court having explicitly limited its ruling to the defendant's motion for sanctions, and the defendant, having made no effort to call L as a witness at trial, therefore failed to take steps to exercise his right to present a defense where the witness' absence at trial was due to his failure to call her.

Argued September 13, 2021—officially released January 25, 2022

*Procedural History*

Substitute information charging the defendant with eight counts each of the crimes of cruelty to persons and disorderly conduct, brought to the Superior Court in the judicial district of Middlesex and tried to the jury before *Suarez, J.*; verdict and judgment of guilty of

three counts of cruelty to persons and five counts of disorderly conduct, from which the defendant appealed to this court. *Affirmed.*

*Norman A. Pattis*, with whom, on the brief, was *Kevin Smith*, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Michael A. Gailor*, state's attorney, and *Jeffrey Doskos*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

CRADLE, J. The defendant, Mark Cusson, appeals from the judgment of conviction, rendered after a jury trial, of three counts of cruelty to persons in violation of General Statutes § 53-20 (a) (1), and five counts of disorderly conduct in violation of General Statutes § 53a-182 (a) (2). On appeal, the defendant claims that (1) the trial court violated his sixth amendment right to present a defense by failing to take adequate procedural measures before ruling that the victim was incompetent to testify, (2) the trial court violated his due process right to offer witness testimony by failing to sanction the prosecution for intimidating potential defense witnesses from testifying at trial, and (3) the state engaged in prosecutorial impropriety by alerting the trial court as to potential fifth amendment concerns with a defense witness' expected testimony during a pretrial hearing, effectively precluding the witness from testifying and denying the defendant his due process right to a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. From January, 1998, until March, 2017, the defendant was employed as a forensic nurse at Whiting Forensic Hospital (Whiting), a maximum security psychiatric facility in Middletown operated by the Department of Mental Health and Addiction Services (department). At the time of the March, 2017 incidents that led to his prosecution, the defendant held the title of forensic head nurse and was assigned to Unit 6 of the facility.[1]

The victim, William Shehadi, was committed to Whiting in 1995 after being found not guilty, by reason of mental disease or defect, of killing his father and seriously injuring his mother. Although the victim's initial commitment was for a period of ten years, his term of commitment has been subject to review and extended every two years by the Psychiatric Security Review Board (board).[2] He was assigned to Unit 6 from 2002 until the March, 2017 incidents that led to the defendant's arrest, at which point the victim was transferred to a different unit.

The victim suffers from several diagnosed mental health illnesses, including schizoaffective disorder, bipolar type; autism spectrum disorder; and a personality disorder with borderline narcissistic and antisocial traits. He is physically aggressive and tends to make racially hostile and sexually inappropriate statements to others. The victim's mental health disorder also causes sudden and significant mood swings, which render him easily agitated and prone to violent outbursts. This behavior has caused Whiting staff to frequently place the victim in physical restraints. On several occasions, he has caused injury to hospital staff, other patients, and himself.

Due to the challenges posed by the victim's condition,

Whiting placed him under special "two-to-one" observation orders.[3] The hospital also installed a continuous video feed in the victim's room to more closely monitor his behavior without the physical intrusion of staff.[4] Between March 3 and 17, 2017, the video camera in the victim's room recorded several incidents that led to the defendant's arrest. Those recordings appeared to depict the defendant, and other Whiting staff, physically abusing and demeaning the victim. Specifically, the video recordings show the defendant repeatedly kicking the victim as he lay in bed and kicking the victim off the bed and onto the floor. On several occasions, the defendant restrained the victim by wrapping his legs around the victim's head. The defendant was also shown pouring a cup of liquid on the victim and draping a mop on top of the victim's head. In one instance, the defendant positioned his buttocks near the victim's face and held that position for several seconds. In another, the defendant climbed on top of and straddled the victim, placing his groin near the victim's face, and appeared to thrust his crotch in the victim's direction. During these incidents, other Whiting staff were present in the victim's room and observed the defendant's actions. These interactions and uses of physical restraint were not recorded in Whiting's observation logs.[5]

The department and Whiting administration learned of the defendant's conduct in late March, 2017.[6] The department then informed state law enforcement and launched an administrative investigation.[7] The defendant was subsequently arrested and charged with eight counts of cruelty to persons and eight counts of disorderly conduct.

A jury trial commenced on March 25, 2019. At trial, the defendant testified that his conduct was intended to be therapeutic rather than abusive. He claimed that he acted in response to the victim's growing agitation, that the victim was soothed by human touch, and that the use of leg restraints was an attempt to perform a swaddling technique meant to comfort the victim. On cross-examination, the defendant admitted that these techniques were neither part of the victim's treatment plan nor approved by Whiting. The defendant also stated that he failed to document the use of physical restraint, which is required under Whiting policy.

The jury subsequently found the defendant guilty of three counts of cruelty to persons and five counts of disorderly conduct. On August 14, 2019, the trial court, *Suarez, J.*, sentenced the defendant to fifteen years of incarceration, execution suspended after five years, followed by three years of probation with special conditions. This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

The defendant first claims that the trial court violated

his sixth amendment right to present a defense[8] by ruling that the victim was incompetent to testify at the defendant's trial. Specifically, the defendant argues that the court abused its discretion by (1) failing, as a matter of procedure, to conduct its own examination of the victim before making a competency determination, and (2) denying the defendant's motion to order an independent psychiatric evaluation of the victim. We disagree with the defendant's arguments and will address them in turn.

The following additional facts and procedural history are relevant to the resolution of this claim. On February 26, 2019, the state filed a motion in limine, pursuant to § 6-3 of the Connecticut Code of Evidence, seeking to preclude the victim's testimony on the basis that "[he] suffers from a serious mental illness, which makes him incapable of understanding the duty to tell the truth and incapable of sensing, remembering, or expressing himself."[9] In support of its motion, the state sought to offer expert testimony from Shana Berger, the principal psychiatrist for the department and, at the time of trial, the victim's treating psychiatrist at Whiting. On March 6, 2019, the defendant filed an objection to the state's motion, arguing that Dr. Berger's testimony alone was legally insufficient to preclude the victim's testimony on the basis of incompetence.

On March 13, 2019, the trial court held a pretrial hearing on the state's motion in limine. At the hearing, the state called Dr. Berger to testify as to the victim's ability to receive and remember sensory impressions, his capacity for truthfulness, and his ability to express himself in ways that others can understand. Dr. Berger testified that she became a board certified psychiatrist in 2011. She stated that she was currently serving as the victim's treating psychiatrist and had been the victim's treating psychiatrist since March 22, 2017.[10] She clarified that her treatment plan involved personally observing and conversing with the victim "every weekday and [on] some weekends." Those interactions lasted anywhere from a few minutes to one-half hour and occurred multiple times throughout the day.

Dr. Berger testified that the victim was diagnosed with schizoaffective disorder, bipolar type; autism spectrum disorder; and a personality disorder with borderline antisocial and narcissistic traits, and had been diagnosed with other mental afflictions in the past. Dr. Berger explained that these disorders have resulted in several cognitive and communicative problems. She also clarified that these issues are rooted in the victim's psychosis and that his condition has been worsening over time.

Dr. Berger explained further that the victim has poor cognitive memory, has trouble retaining information, and is unable to accurately "observe what's going on around him and report it back in a factual manner."

She testified that he is not oriented to time as are typical individuals, and he experiences difficulty understanding temporal concepts like days and months. As a result, the victim is unable to narrate events or recall past experiences in a rational way. Although he is occasionally capable of expressing preferences, his answers to questions tend to be illogical and disjointed. When the victim was asked specifically about the March, 2017 incidents at issue, Dr. Berger testified that the victim "didn't respond . . . wasn't able to answer questions . . . ignored the question or answered in a manner that didn't make sense."

Dr. Berger also revealed that the victim has been diagnosed with tardive dyskinesia, a neurological disorder that affects the musculature of his tongue and mouth.[11] Consequently, the victim has difficulty expressing himself when speaking. Dr. Berger estimated that others can only understand "maybe 30 to 40 percent of what he says."

Dr. Berger asserted that the victim would not respond well to being transported to court for a competency determination. She explained that the victim had not left Whiting voluntarily for several years and that he becomes "very agitated" when forced to leave for medical emergencies, requiring physical restraint and involuntary medication to effectively transport him to the hospital. Notably, Dr. Berger testified that, in 2017, a probate judge attempted to conduct a hearing in the victim's room because the victim refused to leave Whiting. When the judge asked the victim questions, the victim "hid under blankets and didn't answer anything."

The court proceeded to hear argument from both sides. The state contended that Dr. Berger's testimony alone was sufficient to establish that the victim was incapable of providing reliable and truthful testimony. In response, defense counsel moved for an independent psychiatric evaluation of the victim. Specifically, defense counsel argued that an independent evaluation would help clarify whether the victim was *unable* to testify, or whether he was simply *unwilling* to answer questions regarding the March, 2017 incidents that led to the defendant's arrest. The court denied the defendant's motion, stating that the decision whether to order a psychiatric evaluation is "left to the sound discretion of the [trial] court, and . . . should be [done] on a limited basis."

Alternatively, defense counsel requested that the court arrange a "face-to-face" opportunity to evaluate the victim under oath, either at Whiting or via electronic video conference. The court asked defense counsel for a proffer as to the "relevant testimony" that the victim would present at trial. Defense counsel responded that he intended to show the victim the March, 2017 video recordings and have the victim explain the context behind the video. Specifically, defense counsel sought

to ask the victim "about what was said at those times, what [the victim] said, [and] whether there was any provocation at any point."

On March 19, 2019, the court issued an oral decision granting the state's motion in limine. Crediting Dr. Berger's testimony, the court explained that the victim experiences difficulty communicating, has limited cognitive memory, is incapable of reliably answering questions, and poses a physical safety risk to those around him. The court made a finding that "he's not oriented to date, day or month. He's incapable of applying information. His recollection is poor and he's not able to respond to questions. He's incapable of narrating events." The court concluded that the victim "does not have the capacity to perceive, remember, and relay facts in a truthful manner, and for those reasons . . . is not minimally credible or otherwise minimally competent to testify." The court also denied the defendant's renewed motion to voir dire the victim via video conference, stating that the court was capable of making the necessary findings "based on the evidence presented to it . . . ."

Having discussed the court's ruling, we begin by setting forth the legal principles and standard of review that guide our analysis of this claim. "A [criminal] defendant has a constitutional right to present a defense, but he is [nonetheless] bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes." (Internal quotation marks omitted.) *State* v. *Mark T.*, 339 Conn. 225, 231–32, 260 A.3d 402 (2021). Indeed, "[t]he right to present a defense does not compel the admission of any and all evidence offered for that purpose. . . . The trial court retains the discretion to rule on the admissibility, under the traditional rules of evidence, regarding the defense offered." (Citation omitted.) *State* v. *Shabazz*, 246 Conn. 746, 758 n.7, 719 A.2d 440 (1998), cert. denied, 525 U.S.1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999). "Accordingly, [i]f the proffered evidence is not relevant [or is otherwise inadmissible], the defendant's right to [present a defense] is not affected, and the evidence was properly excluded." (Internal quotation marks omitted.) *State* v. *Mark T.*, supra, 232.

"We first review the trial court's evidentiary rulings, if premised on a correct view of the law . . . for an abuse of discretion. . . . If, after reviewing the trial court's evidentiary rulings, we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail." (Internal quotation marks omitted.) *State* v. *David N.J.*, 301 Conn. 122, 133, 19 A.3d 646 (2011).

The defendant first claims that the court abused its discretion by failing to personally observe the victim before ruling as to the victim's capacity to testify. More generally, he contends that a trial court's determination regarding witness competency is procedurally insufficient in the absence of the court's contemporaneous examination of the witness in question. In response, the state argues that Dr. Berger's testimony provided an adequate evidentiary basis to determine that the victim was incompetent to testify at trial. We agree with the state.

Although every person is presumed competent to be a witness; Conn. Code Evid. § 6-1; a person may not testify if (1) "the court finds the person incapable of understanding the duty to tell the truth, or if the person refuses to testify truthfully," or (2) "the court finds the person incapable of receiving correct sensory impressions, or of remembering such impressions, or of expressing himself or herself concerning the matter so as to be understood by the trier of fact either directly or through interpretation by one who can understand the person." Conn. Code Evid. § 6-3.[12]

Insanity or other mental incapacity does not automatically, or even typically, cause testimonial incompetency. *Taborsky* v. *State*, 142 Conn. 619, 629, 116 A.2d 433 (1955); E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 6.3.3, p. 327. Rather, where the competency of a witness is challenged, "the threshold question to be answered by the court is whether the testimony of that witness is minimally credible. If the testimony of a witness passes the test of minimum credibility, and is otherwise relevant, the testimony is admissible and the weight to be accorded it, in light of the witness' incapacity, is a question for the trier of fact." *State* v. *Weinberg*, 215 Conn. 231, 243–44, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). "The competency of a witness is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or of some error in law." (Internal quotation marks omitted.) *State* v. *Canady*, 187 Conn. 281, 291–92, 445 A.2d 895 (1982).

Applying this framework to the present case, we conclude that the court did not abuse its discretion by declining to conduct a contemporaneous examination of the victim before making a competency determination. At the pretrial hearing, Dr. Berger testified that she had personally observed the victim multiple times per day, nearly every day, for a period of two years. As a result, she provided firsthand, expert testimony establishing that the victim has limited cognitive memory, is not oriented to time, and offers irrational responses to even the most basic questions. Dr. Berger clarified that the victim has poor recall and that his narration is unreliable. She also indicated that, when the victim

describes memories, or attempts to convey past events, his speech becomes "disjointed," "disorganized," and he loses touch with reality.[13] Accordingly, the trial judge reasonably could have concluded on the basis of Dr. Berger's testimony that the victim lacks "sufficient powers of observation, recollection, narration and truthfulness [necessary] to meet the threshold requirement of minimum credibility." *State* v. *Weinberg*, supra, 215 Conn. 244; see E. Prescott, supra, § 6.3.3, p. 327.

The defendant nevertheless contends that Dr. Berger's testimony, standing alone, provided an insufficient basis for the court's ruling without the court's own contemporaneous and independent observation of the victim. He has failed, however, to identify any authority holding that a trial court *must* personally observe a potential witness before making a competency determination. Instead, the defendant relies on several cases, including *State* v. *Weinberg*, supra, 215 Conn. 231, in support of his argument. Specifically, the defendant claims that the trial court in *Weinberg* found a witness to be competent, despite the expert psychiatrist's conclusion to the contrary, after listening to the witness' proffered testimony. He argues that this result demonstrates that a trial court's firsthand examination of a proposed witness is procedurally necessary before ruling on his or her competency and that failing to make such an examination constitutes an abuse of discretion.

The trial court in *Weinberg* determined that a witness suffering from " 'severe chronic paranoid schizophrenia' " was, nevertheless, competent to testify at trial. Id., 241–42. Notably, the court disregarded an expert psychiatrist's opinion that the witness was incompetent, finding instead that she was capable of reliably and accurately describing the crime scene where the defendant had taken her. Id., 242–44. Our Supreme Court held that the trial court did not abuse its discretion in reaching a different determination from the expert witness and, consequently, admitting the contested testimony. Id., 244. Although the trial court disagreed with the expert's ultimate conclusion regarding the witness' competency, it focused on the "substance of [the expert's] testimony," which revealed that the witness' "cognitive memory was intact, her factual reports tended to be accurate, and she understood the moral duty of truthfulness." Id. Moreover, despite his ultimate conclusion, the expert noted that the witness' testimony might be credible if it were independently corroborated by other evidence, which the trial court found to be the case. Id. Under those facts, our Supreme Court found that the court correctly determined that the witness met the minimum credibility requirement necessary to testify at trial. Id.

We find the defendant's reliance on *Weinberg* to be misplaced. As an initial matter, the trial court in *Weinberg* did not rely solely on its own contemporaneous

observation of the witness in making its competency ruling. Rather, as our Supreme Court explicitly stated, the trial court focused on the *substance of the expert's testimony* in determining that the witness could remember relevant events and recount them in a reliable and truthful manner. Id. Put another way, the trial court credited the expert's description of the witness' mental illness but reached its own determination as to whether the witness met the minimum credibility requirement necessary to be deemed competent. Although the court did listen to the witness' proffered testimony, it did so to determine whether her factual account could be independently corroborated, and not to appraise the degree of her mental illness. Moreover, the court's decision to evaluate the witness' testimony for evidence of independent corroboration came at the expert's suggestion. See id. ("[expert's] conclusion that the witness was not competent to testify was . . . based upon his clinical diagnosis of [the witness'] mental illness, although he acknowledged that her testimony, if independently corroborated, might be credible"). Stated plainly, the trial court in *Weinberg* relied on the substance of the expert psychiatrist's testimony, and not its own contemporaneous examination, to determine the witness' capacity for truthfulness, cognitive memory, and ability to receive correct sensory impressions. As such, *Weinberg* does not stand for the proposition that a trial court necessarily abuses its discretion by declining to conduct an in-person examination of a proposed witness.

Second, *Weinberg* only underscores the discretionary power of trial courts to make competency rulings. In that case, the expert's conclusion that the witness was incompetent to testify was based on his *clinical diagnosis* that the witness suffered from severe chronic paranoid schizophrenia. Id., 242. Despite that diagnosis, the trial court reached the *legal determination*, on the basis of that expert's account, that the witness was able to provide reliable and truthful testimony, which is a matter within the discretion of the trial court. Id., 242–44. Although some federal courts have noted that "it is the better practice for the trial judge either to question the witness [personally] or to be present when the examination is conducted by counsel"; *Shuler* v. *Wainwright*, 491 F.2d 1213, 1224 (5th Cir. 1974); see also *Henderson* v. *United States*, 218 F.2d 14, 17 (6th Cir.), cert. denied, 349 U.S. 920, 75 S. Ct. 660, 99 L. Ed. 1253 (1955); we have found no relevant authority holding that a trial judge is mandated to do so. So long as there is no " 'clear case of abuse' " or " 'some error in law,' " a reviewing court will not disturb the trial judge's ruling. *State* v. *Weinberg*, supra, 215 Conn. 244.

We conclude that, under the factual circumstances presented in this case, the trial court was not required to personally observe the victim before ruling on his competency to testify. Here, the court chose to credit

the substance of Dr. Berger's testimony, which demonstrated the victim's incapacity to accurately and reliably recount past events and agreed with her ultimate conclusion regarding the victim's ability to testify.[14] Likewise, Dr. Berger did not testify, as did the expert in *Weinberg*, that the victim might be found credible if his testimony were independently corroborated. Accordingly, the court did not err in deciding that a brief, in-person observation of the victim was not necessary in light of the detailed testimony of his treating psychiatrist who had interacted with the victim nearly every day for a period of two years.[15] For the foregoing reasons, we conclude that the court did not abuse its discretion in declining to contemporaneously observe the victim before ruling on his competency to testify at trial.

B

In the alternative, the defendant contends that the trial court abused its discretion by denying his motion to have the victim examined by an independent expert witness before ruling on the victim's competency to testify. He argues that Dr. Berger was not specifically "trained to perform competency examinations" and that her role as the victim's treating psychiatrist presented a conflict of interest. We are not persuaded.

It is well established that a "court may order a mental examination of a witness if the court is in doubt as to the witness's mental competency . . . but the court is not bound to order such an examination in all cases or merely because it is requested by a party." (Citation omitted.) E. Prescott, supra, § 6.3.6, p. 329; see also *State* v. *Vars*, 154 Conn. 255, 268, 224 A.2d 744 (1966). The decision to order a psychiatric examination is a matter within the discretion of the trial judge. *State* v. *Canady*, supra, 187 Conn. 291–92.

Our Supreme Court has repeatedly held that a trial court's refusal to order a psychiatric examination does not constitute an abuse of discretion in the absence of a compelling reason to do so. See id., 292; see also *State* v. *Vars*, supra, 154 Conn. 268; *State* v. *Morant*, 242 Conn. 666, 679–85, 701 A.2d 1 (1997). In the present case, the victim had already undergone a psychiatric assessment by a board certified psychiatrist who, having personally observed him nearly every day for two years prior to the hearing, was uniquely positioned to assist the court in evaluating the victim's testimonial capacity.[16] The defendant cites no authority holding that a court is required to order a second evaluation, by a second expert, simply because a party disagrees with the first expert or because the expert had previously treated the proposed witness. See *State* v. *Boulay*, 189 Conn. 106, 109, 454 A.2d 724 (1983) (expert psychologist testifying at competency evaluation had treated potential witness for about two years). After hearing Dr. Berger's testimony, the court reasonably could have determined that ordering a second evaluation would have been redun-

dant and a waste of judicial resources. In light of the foregoing, we conclude that the court did not abuse its discretion by denying the defendant's motion.

II

We now turn to the defendant's claim that the trial court violated his due process right to present witness testimony by failing to sanction the prosecution for engaging in witness intimidation. Specifically, the defendant contends that the department, through threat of administrative and occupational discipline, attempted to intimidate current and former Whiting employees from testifying at his trial. Relying on a theory of vicarious liability first annunciated in *Demers* v. *State*, 209 Conn. 143, 153, 547 A.2d 28 (1988), he argues that the department was acting as an investigative arm of the state and, therefore, that its misconduct is attributable to the prosecution. We are not persuaded.

The following additional facts are relevant to this claim. On March 6, 2019, the defendant filed a motion entitled "Defendant's Motion for Sanctions Regarding Intimidation of Witnesses."[17] The defendant's argument centered on disciplinary action taken by the department against two Whiting employees, Sarah Lukman and Lori Hubbard, whom the defendant intended to call as character witnesses. Both Lukman and Hubbard previously had appeared at a sentencing proceeding on behalf of Gregory Giantonio, another Whiting employee accused of similar misconduct toward the victim. At that proceeding, Lukman and Hubbard allegedly exposed the victim's confidential and protected medical information while giving their statements to the court. As a result, the department placed Lukman and Hubbard on administrative leave, pending investigation, for allegedly violating the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1320d et seq.[18] The defendant argued that the administrative actions, and the threat of future actions, "chilled" those witnesses from testifying fully on his behalf. As a remedy, the defendant sought either a dismissal of the charges or a "delay of one year in his trial . . . [to] permit corrective action to be taken by the state so as to assure potential witnesses that there is nothing to be feared by offering truthful testimony."

On March 13 and 18, 2019, the court heard evidence on the defendant's motion for sanctions. The defense first called Lukman to testify as to her fear of appearing as a character witness for the defendant. Lukman, however, invoked her fifth amendment right against self-incrimination and provided little substantive testimony at the hearing.[19]

Next, defense counsel called Hubbard to testify as to her fear of appearing as a witness for the defense. Hubbard testified that she was placed on administrative leave after Giantonio's sentencing hearing, that she was

currently under investigation for divulging confidential medical information, and that she was afraid of "losing [her] job" should she testify on the defendant's behalf. Hubbard also indicated, however, that she appeared at Giantonio's sentencing voluntarily, and that she would appear at the defendant's trial if subpoenaed. She further explained that she would testify at trial if ordered to by the court with the understanding that her testimony would not violate any confidentiality laws.

Defense counsel then called Harold Hempstead, the lead forensic treatment specialist at the department and union delegate for forensic nurses and staff. Hempstead testified that he had concerns that union members would face administrative discipline should they testify on the defendant's behalf or on behalf of others facing similar charges. Specifically, he stated that "[union members] don't truly understand the legalities of everything that's going on, I don't want to violate HIPAA in any way, shape, or form due to the fact that I could be, you know, placed on administrative leave and possibly fired . . . ." He also explained that he was personally afraid of appearing as a defense witness, but that his fear would be alleviated should the victim's conservators sign a release permitting him to testify without violating HIPAA.

Finally, defense counsel called Steven Beaupre, the human resources manager and Director of Labor Relations for the department. Beaupre testified that his office is responsible for investigating and conducting fact-finding for alleged work rule and policy violations, including Lukman's and Hubbard's alleged HIPAA violations. He confirmed that the disciplinary actions taken against Lukman and Hubbard stemmed from the unauthorized disclosure of the victim's confidential medical information during Giantonio's sentencing proceeding.

As to the relationship between the department and law enforcement, Beaupre testified that he had played no role in disciplining the defendant for misconduct or in referring the defendant or any other employee to the state's attorney's office. He could not say, however, whether any other department administrators had played a role in the criminal investigation and prosecution of those individuals. Beaupre clarified that there may be situations, generally, where department investigations may be referred to law enforcement agencies. Additionally, Beaupre confirmed that he had never been contacted by any law enforcement agency regarding Lukman's and Hubbard's appearances at Giantonio's sentencing.

Beaupre also testified that the victim's conservator had signed releases permitting the defendant's witnesses to speak with defense counsel and to testify in court without violating HIPAA. Beaupre asserted that such witnesses would not face administrative action by the department, and that the releases would apply

retroactively to Lukman's and Hubbard's statements at Giantonio's sentencing, effectively nullifying their administrative sanctions.

On March 18, 2019, the court heard argument on the defendant's motion. The defendant contended that the department had been acting as an investigatory arm of the state and, therefore, any misconduct on the part of the department in regard to Lukman, Hubbard, or any other potential defense witness, should be imputed to the prosecution. The defendant also modified his request for sanctions, abandoning his request for a one year delay and seeking instead either a complete dismissal of the charges or an order precluding the prosecution from cross-examining its character witnesses on character-related issues. In response, the state contended that the defendant had failed to demonstrate an agency relationship between the department and the prosecution.

The following day, the court issued an oral ruling denying the defendant's motion for sanctions. Relying on *Stevenson* v. *Commissioner of Correction*, 165 Conn. App. 355, 366, 139 A.3d 718, cert. denied, 322 Conn. 903, 138 A.3d 933 (2016), the court held that the department "is not an investigatory agency of the prosecution" and found that, "even if they were for this particular case, any disciplinary action taken by [the department] . . . was a result of . . . violations of HIPAA . . . and not . . . retaliatory claims." The court also noted that each of the defense witnesses who testified indicated that they would appear as character witnesses at the defendant's trial "if they're subpoenaed to do so and under conditions that would not violate HIPAA requirements."

Having set forth the court's ruling, we turn to the appropriate standard of review and governing legal principles. "A claim that the state has intimidated a defense witness raises serious questions that go to the core of the constitutional right to a fair trial. A defendant's right to offer the testimony of witnesses is protected by the due process clause of the fourteenth amendment. . . . The prosecution violates this important right when it engages in conduct or makes comments aimed at discouraging defense witnesses from testifying freely. . . . Substantial government interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *O'Brien*, 29 Conn. App. 724, 731–32, 618 A.2d 50 (1992), cert. denied, 225 Conn. 902, 621 A.2d 285 (1993).

"When information comes to a court's attention that suggests that there has been government interference with a defense witness' free and unhampered choice to testify, the due administration of justice may require further inquiry by the trial court. Nonetheless, [a] trial [court] is given great latitude in ensuring that a criminal trial be conducted in a manner that approaches, as

nearly as possible, an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. . . . Given the fact that the trial [court] is not simply a referee presiding over a forensic contest, but is a minister of justice, [it] is, for that purpose, vested with the authority to exercise a reasonable discretion in the conduct of a trial." (Internal quotation marks omitted.) Id., 733.

"The trial court possesses the inherent power to impose sanctions on litigants in cases before it, including dismissing the case, both to compel observance of its rules and to bring an end to continuing violations of those rules. . . . This power rests within the discretion of the trial court and will not be disturbed on review unless there is an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *Emerick* v. *Glastonbury*, 177 Conn. App. 701, 702–703, 173 A.3d 28 (2017), cert. denied, 327 Conn. 994, 175 A.3d 1245 (2018). With these principles in mind, we turn to the defendant's arguments on appeal.

A

The defendant's claim contains two interrelated parts. First, he argues that the administrative actions taken against Lukman and Hubbard were intended to "chill" potential witnesses from participating in future prosecutions involving mistreatment of the victim. Second, he argues that an agency relationship existed between the department and the prosecution, such that any misconduct committed by the department is attributable to the state.[20] We are not persuaded.

As an initial matter, the record lacks any evidence indicating that the department sought to intimidate defense witnesses through administrative discipline. The trial court clearly found in its oral decision that any action taken by the department against its employees resulted solely from the employees' HIPAA violations. That factual finding is fully supported by the record.[21]

The record also indicates that the victim's conservator had signed releases permitting defense witnesses to testify regarding the victim's health status. With those releases secured, Beaupre confirmed that the department would not take any action against witnesses who testified regarding the victim. Moreover, Lukman and Hubbard were retroactively absolved from administrative penalties resulting from their statements at Giantonio's sentencing. As such, the defendant's witnesses were not under threat of administrative discipline at the time of the evidentiary hearing. Further, as the court noted, Hubbard was not included on the defendant's witness list until March, 2019, well after the department placed her on administrative leave. Accordingly, the argument that the department sought to intimidate witnesses from testifying at the defendant's trial is speculative and unsupported by the evidence in the record.

Additionally, the defendant has failed to demonstrate that an agency relationship existed between the department and the prosecution. It is true that, in the context of *Brady*[22] violations, our Supreme Court has held that prosecutorial misconduct extends to state agencies acting on the prosecution's behalf.[23] *Demers* v. *State*, supra, 209 Conn. 153; *State* v. *Guerrera*, 331 Conn. 628, 647–48, 206 A.3d 160 (2019). Therefore, where an agency works under the prosecution's direction on a given investigation, its conduct is fairly attributable to the state. *State* v. *Guerrera*, supra, 647–48. "Nonetheless, [misconduct] on the part of persons employed by a different office of the government does not in all instances warrant the imputation of [misconduct] to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis." (Internal quotation marks omitted.) *Stevenson* v. *Commissioner of Correction*, supra, 165 Conn. App. 366.

"[O]ur determination of whether to deem an [agency] to be an arm of the prosecution . . . does not follow [a] broad, categorical approach . . . . Instead, the propriety of imputing [misconduct] to the prosecution is determined by examining the specific circumstances of the [agency] alleged to be an arm of the prosecutor. . . . It does not turn on the *status* of the [agency] . . . such as . . . law enforcement . . . prosecut[ion] or other government official[s]. In other words, the relevant inquiry is what the [agency] *did*, not wh[at] the [agency] *is*." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 367.

In support of his argument, the defendant points to the fact that department employees had given statements to outside law enforcement regarding the victim's alleged abuse. The defendant also notes that Whiting staff had provided law enforcement with the video footage from the victim's room. Our Supreme Court has determined, however, that even when an agency undertakes some actions at the direction of the prosecution, it is not necessarily deemed to be an arm of the prosecution when undertaking other actions. See *State* v. *Guerrera*, supra, 331 Conn. 648–49 (holding that Department of Correction was investigative arm of state for percentage of codefendant's phone recordings reviewed at prosecution's direction, but not for percentage of recordings stored solely for its internal security and administrative purposes).

In order to show that the department acted as an arm of the prosecution, the defendant must demonstrate a relationship between the prosecution and the specific adverse employment actions taken against Hubbard and Lukman. The record does not reflect that Beaupre, who

was primarily responsible for the internal investigation against the two employees, had any contact with any law enforcement body during the pendency of the investigation.

The record indicates that the department's administrative investigations serve a function distinct from criminal investigations, namely, to examine and sanction potential work rule violations and other policy violations. Thus, the purpose of internal investigations is to ensure that employees follow workplace regulations, not to be an auxiliary fact finder for law enforcement.[24] See *Stevenson* v. *Commissioner of Corrections*, supra, 165 Conn. App. 368 (holding that Department of Correction was not investigative arm of state where exculpatory documents at issue were produced for internal, administrative purposes, not for assisting prosecutor's investigation). Accordingly, the record does not support the conclusion that the administrative actions taken against Lukman and Hubbard were conducted at the prosecution's direction. As stated previously, the investigation was performed solely to ascertain whether the employees violated HIPAA by disclosing protected medical information at Giantonio's sentencing hearing. The trial court correctly determined that the department was not acting as an arm of the state and, therefore, did not abuse its discretion by denying the defendant's motion for sanctions.

B

Even if we assume that the trial court improperly denied the defendant's motion for sanctions, the defendant is unable to demonstrate that the denial violated his due process right to present witness testimony. "[W]hether a trial court's . . . restriction of a defendant's or defense [witness'] testimony in a criminal trial deprives a defendant of his [due process] right to present a defense is a question that must be resolved on a case by case basis. . . . The primary consideration in determining whether a trial court's ruling violated a defendant's right to present a defense is the centrality of the excluded evidence to the claim or claims raised by the defendant at trial." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 276, 96 A.3d 1199 (2014). "The constitutional right to present a defense does not include the right to introduce any and all evidence claimed to support it." *State* v. *Shabazz*, supra, 246 Conn. 752 n.4.

Our careful review of the record leads us to conclude that the trial court's denial of the defendant's motion for sanctions did not deprive the defendant of the opportunity to offer witness testimony or to present a complete defense. As an initial matter, there is no evidence that any witness testimony was actually excluded. Although Hubbard and Hempstead initially expressed reluctance to serve as defense witnesses, they both appeared and testified at the defendant's trial.[25] The

record does not demonstrate that their testimony was curtailed in any way by threat of administrative discipline.

Moreover, Hubbard and Hempstead were only two of several character witnesses who appeared in support of the defendant at trial.[26] Our Supreme Court has held that the exclusion of cumulative evidence does not violate a criminal defendant's constitutional right to present a defense. *State* v. *Dehaney*, 261 Conn. 336, 366–67, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003). In addition, this court has held that "[a] defendant may not successfully prevail on a claim of a violation of his right to present a defense if . . . he adequately has been permitted to present the defense by different means." (Internal quotation marks omitted.) *State* v. *Papineau*, 182 Conn. App. 756, 781, 190 A.3d 913, cert. denied, 330 Conn. 916, 193 A.3d 1212 (2018). Even assuming that Hubbard and Hempstead were discouraged from testifying freely, their unencumbered testimony would merely have reiterated what was already before the jury. The defendant does not argue that his other character witnesses, many of whom are current or former Whiting employees, were intimidated from providing full and complete testimony. Accordingly, the defendant was not denied the ability to offer witness testimony attesting to his reputation for peacefulness and nonviolence. We conclude, therefore, that the trial court's refusal to grant the defendant's motion for sanctions did not give rise to a constitutional violation.

### III

The defendant's final claim is that the prosecution engaged in impropriety by informing the trial court of potential fifth amendment concerns regarding a witness' anticipated testimony during a pretrial evidentiary hearing. The defendant argues that raising those concerns intimidated the witness and caused her to invoke her fifth amendment privilege against self-incrimination, effectively precluding her from testifying further on his behalf. The defendant also contends that the trial court ratified the prosecutor's misconduct by granting the witness a "blanket fifth amendment privilege," thereby denying him his right to present a defense and compel witnesses in his favor. We reject both arguments.

The following additional facts and procedural history are relevant to our disposition of this claim. During the March 13, 2019 hearing on the defendant's motion for sanctions, defense counsel called Lukman to testify as to the disciplinary action the department took against her, as well as the defendant's reputation for nonviolence. Before defense counsel began his direct examination, the prosecutor informed the court that there was a possibility that Lukman could incriminate herself if she were to testify at the hearing. Specifically, the prose-

cutor stated that defense counsel "filed an appendix to his motion, which involves [a Federal Bureau of Investigation (FBI)] report, 302 report, which indicates an investigator from the FBI who spoke with Ms. Lukman and detailed the discussions he had with Ms. Lukman during [this] investigation. . . . I believe that there are statements in there that could potentially be incriminating against Ms. Lukman, and . . . the court should provide her with an advisement as she should have a right to an attorney prior to making a decision as to whether she testifies."

Defense counsel responded that the state previously had determined not to prosecute Lukman and that the prosecutor's warning was an attempt to procure the unavailability of the witness. Defense counsel then moved for the trial court to grant Lukman use immunity[27] and to sanction the state for attempting to intimidate Lukman with the threat of prosecution. The prosecutor asserted that the state did not intend to prosecute Lukman for simply testifying, but stressed that, because the FBI report could contain potentially incriminating information, she should speak with a lawyer before deciding whether to testify. After reviewing the FBI report, the court agreed with the prosecutor, and provided Lukman with an opportunity to consult counsel before proceeding as a witness.

When the hearing resumed on March 18, 2019, Lukman appeared with her counsel, Jeffrey Kestenband. Attorney Kestenband filed a motion to quash defense counsel's subpoena for his client and stated that Lukman intended to invoke her fifth amendment right against self-incrimination "as to, pretty much, any substantive question" she was asked. Defense counsel objected, claiming that Lukman could not legally assert a "blanket" fifth amendment protection. The trial court sustained the objection, stating, "We can call [Lukman] to testify . . . . We'll listen to the questions and [if there are] questions on the grounds of the fifth amendment privilege . . . then we'll take it up."

Lukman subsequently took the stand and proceeded to answer some of defense counsel's questions. Afterward, Attorney Kestenband objected to a series of defense counsel's questions, effectively invoking Lukman's fifth amendment privilege on her behalf. Defense counsel objected in turn, claiming that the fifth amendment right against self-incrimination is a personal right that cannot be asserted by counsel. The court agreed with defense counsel, stating that if Lukman wished to invoke the right, she would have to do so herself. The court indicated, however, that it would call a recess if and when Attorney Kestenband wished to advise Lukman regarding self-incrimination concerns. Irrespective of the trial court's offer, Attorney Kestenband continued to object to defense counsel's questions on fifth amendment grounds.

After a brief recess, the court ruled that it would allow Lukman to invoke her right not to testify against herself. Citing *State* v. *Ayuso*, 105 Conn. App. 305, 313, 937 A.2d 1211, cert. denied, 286 Conn. 911, 944 A.2d 983 (2008), the court stated that the mere possibility that Lukman could be prosecuted for her testimony rendered her fifth amendment claim valid. The court then asked Lukman explicitly whether she intended to invoke her fifth amendment right as to defense counsel's subsequent question. Lukman answered, "yes. Based on the advice of counsel." Afterward, the court permitted defense counsel to state his remaining questions on the record. The court again asked Lukman whether she would invoke her fifth amendment privilege as to each question defense counsel listed, to which Lukman answered, "yes."

Finally, the court clarified that its ruling explicitly pertained to the pretrial motion for sanctions and that it was too early to determine whether the ruling would extend to the criminal trial. The court stated that defense counsel should reclaim the issue if he sought to have Lukman testify at trial.

### A

The defendant first contends that the prosecutor engaged in impropriety by alerting the court as to the potential fifth amendment concerns with Lukman's testimony, which he claims constituted a veiled threat meant to discourage Lukman from testifying and effectively denied him his due process right to a fair trial. We disagree.

"It is well established that [i]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . [W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper. . . . If we conclude that prosecutorial impropriety occurred, we then decide whether the defendant was deprived of his due process right to a fair trial . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Williams*, 200 Conn. App. 427, 432–33, 238 A.3d 797, cert. denied, 335 Conn. 974, 240 A.3d 676 (2020).

After carefully considering the record in this appeal, we conclude that the prosecutor did not engage in impropriety. There is no evidence that the prosecutor undertook his warning with the intention to chill Lukman from testifying. In fact, the prosecutor repeatedly stated that, based on known evidence, the state did not intend to pursue criminal charges against Lukman.

The prosecutor was concerned, however, that any testimony surrounding the FBI report could reveal additional information supporting state or federal charges against Lukman. Although Lukman was only proffered to testify as to the defendant's character, the uncertain nature of cross-examination and direct examination left open the possibility that Lukman could make incriminating statements regarding the contents of the report. Moreover, Lukman originally appeared without counsel, had received no grant of immunity from the state or federal government, and may not have been aware of the report's existence at the time of the pretrial hearing. The prosecutor alerted the court as to these concerns and recommended that Lukman be advised of her rights and given the opportunity to seek counsel before testifying. The defendant cites no relevant authority holding that such actions are improper. We conclude, therefore, that the prosecutor did not engage in impropriety by bringing Lukman's potential for self-incrimination to the attention of the court. Because we conclude that no impropriety occurred, we need not consider whether the prosecutor's warning deprived the defendant of his due process right to a fair trial.

B

The defendant's final argument is that the court denied his right to present a defense and compel witness testimony in his favor by improperly granting Lukman a blanket fifth amendment privilege during the pretrial hearing on the defendant's motion for sanctions. Specifically, the defendant claims that the court's "decision to grant Lukman a blanket fifth amendment privilege against testifying . . . secured Lukman's unavailability" at trial. We disagree.

This court has repeatedly held that "[a] defendant may not successfully prevail on a claim of a violation of his right to present a defense if he has failed to take steps to exercise the right or if he adequately has been permitted to present the defense by different means." (Internal quotation marks omitted.) *State* v. *Leniart*, 198 Conn. App. 591, 603–604, 233 A.3d 1183, cert. denied, 335 Conn. 971, 240 A.3d 1055 (2020); see also *State* v. *Porfil*, 191 Conn. App. 494, 522, 215 A.3d 161 (2019), appeal dismissed, 338 Conn. 792, 259 A.3d 1127 (2021).

Although the court permitted Lukman to invoke her fifth amendment privilege during the pretrial hearing, it explicitly limited its ruling to the defendant's motion for sanctions. When asked specifically whether its ruling extended to trial, the court clarified that its ruling was limited to the motion for sanctions and did not extend beyond that. In addition, the court informed the defendant that he would have an opportunity to "reclaim the issue" as to whether Lukman could invoke a valid fifth amendment privilege at the start of trial. The defendant made no effort to call Lukman as a witness

at trial.[28] It is clear from the record that Lukman's absence at trial was due to the defendant's failure to call her, and not the court's limited ruling at the pretrial hearing. In light of the foregoing, the defendant has " 'failed to take steps to exercise' " his right to present a defense. *State* v. *Leniart*, supra, 198 Conn. App. 603–604. Accordingly, he cannot demonstrate that his right was violated by the trial court's ruling.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The forensic head nurse supervises the nursing staff in a given unit. As forensic head nurse, the defendant was responsible for supervising the administration of medication and patient care, executing behavioral treatment plans and treatment plans, responding to and documenting patient behavior, and fulfilling various other managerial and administrative duties.

[2] The board is comprised of six members appointed by the governor. It is charged with conducting biennial hearings to determine whether a given patient may be transferred out of a maximum security setting or whether the individual remains mentally ill and potentially dangerous to others, and, consequently, must continue to remain at Whiting. Since 2005, the board has made successive determinations that the victim remains a threat to himself and those around him. At the time of trial, the victim's most recent recommitment was in 2018.

[3] Under those orders, two staff members were required to physically observe the victim at all times and document his behavior in writing every fifteen minutes. Two-to-one observation is the most intense level of observation at Whiting.

[4] The camera in the victim's room was installed to relieve stress on the victim and reduce physical contact between the victim and Whiting staff. It had been operative for at least a decade prior to the March, 2017 incidents that led to the defendant's prosecution. Notably, the camera only captured video footage, which was admitted into evidence by the state at trial. No audio recording equipment was included with the camera when it was initially installed and it was not installed thereafter. Consequently, the security footage taken from the victim's room does not include sound.

[5] Whiting hospital policy mandated that nursing staff submit a detailed report of each use of physical restraint imposed on a patient under that staff member's care. As mentioned above, nursing staff was also required to document the victim's behavior every fifteen minutes. See footnote 3 of this opinion.

[6] The record is unclear as to how exactly the defendant's behavior was first brought to the attention of the department's administration.

[7] The investigation led to criminal charges and adverse employment actions against several department employees involved in the victim's treatment. The defendant was suspended from his position at Whiting, pending administrative review. He retired from the department before it held a hearing to review his conduct.

[8] In his brief to this court, the defendant also argues that the "the trial court denied [his right to confront witnesses against him] when it granted the state's motion [in limine] and precluded the testimony of [the victim] . . . ." He has failed, however, to analyze this particular constitutional claim or support it with relevant authority. "It is well established that the appellate courts of this state are not obligated to consider issues that are not adequately briefed. . . . Whe[n] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived. . . . In addition, mere conclusory assertions regarding a claim, with no mention of relevant authority and minimal or no citations from the record, will not suffice. [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed . . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Citation omitted; internal quotation marks omitted.) *Manere* v. *Collins*, 200 Conn. App. 356, 358–59 n.1, 241 A.3d 133 (2020). Because we conclude that the defendant's confrontation clause claim was not adequately briefed, we decline to review it.

[9] Specifically, the state moved to exclude the victim's testimony on the basis of both § 6-3 (a) of the Connecticut Code of Evidence, which provides that "[a] person may not testify if the court finds the person incapable of understanding the duty to tell the truth, or if the person refuses to testify truthfully," and § 6-3 (b) of the Connecticut Code of Evidence, which provides that "[a] person may not testify if the court finds the person incapable of receiving correct sensory impressions, or of remembering such impressions, or of expressing himself or herself concerning the matter so as to be understood by the trier of fact either directly or through interpretation by one who can understand the person."

[10] The victim was transferred out of Unit 6 after allegations against the defendant, and others, were brought to the attention of Whiting administration. Dr. Berger subsequently assumed responsibility as the victim's treating psychiatrist.

[11] Dr. Berger testified that the victim's tardive dyskinesia stems from antipsychotic medication treatment over a long period of time.

[12] Although questions of witness competency and questions involving a criminal defendant's competency to stand trial both require the trial court to determine whether an individual is "competent," we note that "[t]he mental or emotional state of a person sufficient to be competent to 'testify' as a witness should be *sharply distinguished* from the mental or emotional state of an accused sufficient to be competent 'to stand trial.' " (Emphasis added.) E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 6.3.3, p. 326; see also General Statutes § 54-56d (f). General Statutes § 54-56d (a) clarifies in relevant part that a criminal defendant is not competent to stand trial "if [he] is unable to understand the proceedings against him . . . or to assist in his . . . own defense." The "due process clause of the fourteenth amendment to the United States constitution prohibits the criminal prosecution of a defendant who is not competent to stand trial . . . [and] demands that, once a defendant's competence to stand trial has been sufficiently called into question, the trial court must order an adequate hearing on his competence to stand trial . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Dort*, 315 Conn. 151, 162, 106 A.3d 277 (2014). In contrast, a person with mental or psychiatric problems serving as a witness should be "judged on the standard whether the person has useful information to impart to the trier of fact as a witness, not on the basis that he or she is incapable in some other role." E. Prescott, supra, § 6.3.3, p. 326. Accordingly, "a person who is found not competent to stand trial when charged with a crime may still be competent to testify at someone else's trial." Id.

[13] Additionally, Dr. Berger testified that the victim's speech is often unintelligible due to involuntary oral movements caused by tardive dyskinesia, and, thus, he is largely incapable of expressing himself in a manner "so as to be understood by the trier of fact . . . ." Conn. Code Evid. § 6-3 (b). Even Dr. Berger, who converses with the victim almost every day, testified that she could only understand 40 to 50 percent of what he says.

[14] Additionally, we note that this case does not present a situation in which the expert psychiatrist was appointed just prior to trial. In such circumstances, an expert may only meet with a proposed witness on a few, limited occasions before offering an opinion regarding the witness' competency. Conclusions drawn from such cursory examinations may be less valuable than those produced by an expert's continued observation of a witness over time. Stated otherwise, an expert witness' limited examination may be no more revealing than a trial court's personal voir dire of the witness in question. By contrast, in this case, the expert's testimony drew on her extensive, firsthand experience treating the victim over the course of multiple years. Accordingly, she was able to provide insight into the victim's cognitive and communicative state that could not have been ascertained through the trial court's limited examination.

[15] We also note that the previous attempt to question the victim in a judicial setting had been unsuccessful. The 2017 probate hearing was a contemporaneous, in-person proceeding that resulted in the victim hiding from the probate judge and refusing to answer any of the judge's questions. As Dr. Berger also made clear, the victim's condition continues to deteriorate.

[16] That Dr. Berger was not specifically "trained to perform competency examinations" is of no issue. As the defendant himself has emphasized, competency evaluations are *judicial* determinations within the discretion of the trial court. *State* v. *Canady*, supra, 187 Conn. 291–92.

[17] The defendant also filed a "Supplemental Memorandum in Support of

[his] Motion for Sanctions Addressing the Scope of State Action" on March 14, 2019.

[18] HIPAA created national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge. "[HIPAA's] Privacy Rule forbids an organization subject to its requirements (a covered entity) from using or disclosing an individual's health information (protected health information) except as mandated or permitted by its provisions . . . . Covered entities generally include health plans, health care clearinghouses and health care providers such as physicians, hospitals and [health maintenance organizations] . . . . Protected health information encompasses any individually identifiable health information held or transmitted by a covered entity in any form or medium, whether electronic, paper or oral." (Internal quotation marks omitted.) *Byrne* v. *Avery Center for Obstetrics and Gynecology, P.C.*, 314 Conn. 433, 449 n.15, 102 A.3d 32 (2014).

[19] The circumstances surrounding Lukman's fifth amendment invocation will be addressed more fully in part III of this opinion.

[20] The defendant argues, at alternative times, that either the department was as an agent of the state, such that its misconduct is attributable to the prosecution, or, more directly, that the prosecution explicitly directed the department to intimidate defense witnesses. We address both arguments together.

[21] It is well established that "the trial court is given great deference in its fact-finding function because it is in the unique [position] to view the evidence presented in a totality of circumstances . . . including its observations of the demeanor and conduct of the witnesses and parties . . . ." (Internal quotation marks omitted.) *State* v. *Lipscomb*, 258 Conn. 68, 74, 779 A.2d 88 (2001). As such, "[a] trial court's findings of fact are not to be overturned on appeal unless they are clearly erroneous," meaning that "there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Krijger*, 313 Conn. 434, 446, 97 A.3d 946 (2014).

Beaupre testified that the department's disciplinary measures were intended to sanction employees for divulging protected, personal health information, and not to discourage witnesses from testifying at future trials. Stated otherwise, Beaupre provided a reasonable explanation as to why the department placed Lukman and Hubbard on administrative leave: the department concluded that both employees violated HIPAA's privacy rule. In fact, the witnesses who feared adverse employment actions testified to understanding that any potential sanctions would result from disclosing confidential health information, and not from merely appearing in support of their colleagues. Indeed, both Hubbard and Hempstead stated that they would testify at the defendant's trial if assured they could do so without breaching confidentiality laws.

[22] *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[23] Specifically, our Supreme Court has held that the prosecution's duty to disclose favorable evidence to the defense extends to its investigative agencies. *Demers* v. *State*, supra, 209 Conn. 153; *State* v. *Guerrera*, 331 Conn. 628, 647, 206 A.3d 160 (2019). Accordingly, the prosecutor has a duty to learn of exculpatory evidence in possession of an entity that is acting as his agent or arm, and the agent's or arm's knowledge of exculpatory evidence may be imputed to the prosecutor. *State* v. *Guerrera*, supra, 647–48. Neither party has identified, nor have we found, any authority where this doctrine has been applied outside of the *Brady* context. Nevertheless, the defendant contends that the administrative discipline taken against "identifiable and foreseeable defense witnesses" for testifying at Giantonio's sentencing proceeding constituted a violation of due process akin to a *Brady* violation. Therefore, the defendant's claim that alleged witness intimidation on the part of a government agency may be attributed to the prosecution represents a novel theory of vicarious liability.

[24] Underscoring this point, Beaupre clarified that administrative investigations, unlike criminal investigations, are not constrained by certain constitutional safeguards, such as the fifth amendment privilege against self-incrimination.

[25] As will be explored further in part III of this opinion, defense counsel chose not to recall Lukman at the criminal trial, despite the trial court's express invitation to do so. As such, the defendant has failed to show that the trial court's denial of his motion for sanctions deprived him of a

single witness.

[26] In addition to Hubbard and Hempstead, defense counsel called thirteen other witnesses to testify as to Whiting hospital policy as well as the defendant's reputation for peacefulness and nonviolence.

[27] See General Statutes § 54-47a.

[28] During the pretrial hearing, defense counsel stated that Lukman's testimony would be offered to describe the defendant's "reputation for nonviolence." As we previously have noted, the defendant called several witnesses to testify at trial as to his peacefulness within the community. See footnote 26 of this opinion. We conclude, therefore, that the defendant " 'adequately has been permitted to present [his] defense by different means.' " *State* v. *Leniart*, supra, 198 Conn. App. 604.